1  Guido Saveri (22349) guido@saveri.com
   R. Alexander Saveri (173102) rick@saveri.com
2  Cadio Zirpoli (179108) cadio@saveri.com
   William Heye (233249) william@saveri.com
3  SAVERI & SAVERI, INC.
4  111 Pine Street, Suite 1700
   San Francisco, CA 94111
5  Telephone: (415) 217-6810
   Facsimile: (415) 217-6813
6
   Eugene A. Spector
7  William G. Caldes
8  SPECTOR, ROSEMAN & KODROFF, P.C.
   1818 Market Street, Suite 2500
9  Philadelphia, PA 19103
   Telephone: (215) 496-0300
10 Facsimile: (215) 496-6611

11

12 Attorneys for Plaintiff

13

14              IN THE UNITED STATES DISTRICT COURT

15          FOR THE NORTHERN DISTRICT OF CALIFORNIA

16                    SAN FRANCISCO DIVISION

17

18 **JUSTIN LaBARGE**, individually and on      )  CIVIL ACTION NO. _____
   behalf of all others similarly situated,     )
19              Plaintiffs,                      )                                    **SC**
                                                 )
   vs.                                           )  **CLASS ACTION COMPLAINT**
20 **AIR NEW ZEALAND, ALL NIPPON**              )
   **AIRWAYS, CATHAY PACIFIC**                   )  **JURY TRIAL DEMANDED**
21 **AIRWAYS, CHINA AIRLINES, EVA**             )
   **AIRLINES, JAPAN AIRLINES**                  )
22 **INTERNATIONNAL, MALAYSIA**                 )
   **AIRLINES, NORTHWEST AIRLINES,**             )
23 **QANTAS AIRWAYS,  SINGAPORE AIR,**          )
   **THAI AIRWAYS, UNITED AIRLINES**            )
24            Defendants                         )
                                                 )
25                                               )
                                                 )
26 _____          )

27

28

_____

CLASS ACTION COMPLAINT

Pursuant to the Federal Rules of Civil Procedure, Plaintiffs, on behalf of themselves and all others similarly situated, hereby bring this action for treble damages and injunctive relief under the federal antitrust laws of the United States, Section 1 of the Sherman Antitrust Act of 1890, 15 U.S.C. § 1 ("Sherman Act") and Sections 4 and 26 of the Clayton Antitrust Act of 1914, 15 U.S.C. §§ 15, 26 ("Clayton Act") against Defendants. Plaintiffs complain and allege upon information and belief except as to those paragraphs applicable to the named Plaintiffs, which are based on personal knowledge, as follows:

## NATURE OF THE ACTION

1.     This action arises from a global conspiracy among certain airlines to fix, raise, maintain, and/or stabilize prices for long haul passenger transpacific flights to and from the United States ("Passenger Air Transportation"), and for fixed fuel surcharges on this transportation ("Fuel Surcharges"). Fuel surcharges are fees charged to passengers by airlines purportedly to compensate the airlines for increased fuel costs.

2.     Plaintiffs, on behalf of all persons and entities that purchased Passenger Air Transportation, to and from the United States, from any of the Defendants and their co-conspirators or any predecessor, subsidiary, or affiliate of each, at any time during the period beginning on or about May 2004 to August 2007 (the "Class Period"), bring this action to recover treble damages and injunctive relief for violations of the United States antitrust laws.

3.     At all relevant times herein, Defendants were airlines that conducted and sold Passenger Air Transportation, and charged fixed Fuel Surcharges on that transport, to airline passengers in the United States and throughout the world, including but not limited to flights to and from Los Angeles and to and from San Francisco, California. Los Angeles International Airport ("LAX") and San Francisco International Airport ("SFO") are considered the international U.S. gateways to Asian and Pacific countries. The U.S. Department of Transportation reported that in 2005 LAX and SFO were ranked in the top U.S. passenger gateways to the world in scheduled passenger service. That year LAX and SFO had 24.6 million gateway passengers, with the foreign share of the passengers at an average 67%.

CLASS ACTION COMPLAINT

1    4.    As further alleged herein, during at least the Class Period, Defendants agreed,

2  combined, and/or conspired with each other to fix, raise, maintain, and/or stabilize the prices of

3  Passenger Air Transportation and Fuel Surcharges thereon. As a result of Defendants' unlawful

4  conduct and conspiracy, Plaintiffs and the other members of the Class paid artificially high prices

5  for Passenger Air Transportation and Surcharges thereon, and have been damaged accordingly.

6                        **JURISDICTION AND VENUE**

7    5.    This Complaint is brought under Sections 4 and 16 of the Clayton Act, 15 U.S.C.

8  §§ 15 and 26, to obtain injunctive relief and to recover treble damages and the costs of this suit,

9  including reasonable attorneys' fees, against Defendants for the injuries sustained by Plaintiffs

10  and the members of the Class by reason of Defendants' violations of Section 1 of the Sherman

11  Act, 15 U.S.C. § 1.

12    6.    This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and

13  1337, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26.

14    7.    This Court has *in personam* jurisdiction over each of the Defendants because each

15  was engaged in an illegal price-fixing scheme and conspiracy that was directed at and/or caused

16  injury to persons and entities residing in, located in, or doing business in the Northern District of

17  California and throughout the United States.

18    8.    Venue is proper in this judicial district pursuant to 15 U.S.C. § 22 and

19  28 U.S.C. § 1391(b), (c), and (d) because during the Class Period many of the Defendants

20  resided, transacted business, were found, or had agents in this district, and because a substantial

21  part of the events giving rise to Plaintiffs' claims occurred, and a substantial portion of the

22  affected trade and commerce described below has been carried out, in this district.

23                        **MULTI-DISTRICT LITIGATION**

24    9.    Venue is also proper in the Northern District because that court presides over the

25  multi-district litigation *In re International Air Transportation Litigation*, MDL No. 1793. The

26  Hon. Charles R. Breyer presides over the case, and the Court has and will be called upon to

27  address complex issues including jurisdiction, the scope of relief which may be accorded, the

28  application of United States' antitrust and airline law, notice and claims procedures for class

3

CLASS ACTION COMPLAINT

1    members within and outside the United States, and the administration and distribution of any

2    funds which may be obtained through settlement and judgment.

3                                       **PARTIES**

4           10.     Plaintiff, Justin LaBarge, resides in the State of Pennsylvania. Plaintiff LaBarge

5    purchased Passenger Air Transportation from one or more Defendants during the class period

6    and has suffered pecuniary injury as a result of the antitrust violations alleged herein.

7           11.     Defendant Air New Zealand is a New Zealand company with its principal place of

8    business at Quay Tower, 29 Customs St. West, Auckland, 1020, New Zealand. Air New Zealand

9    conducts Passenger Air Transportation throughout the world, including into the U.S. and

10    especially California.

11           12.     Defendant All Nippon Airways is a Japanese company with its principal place of

12    business at Shidome-City Center, 1-5-2, Higashi-Shimbashi, Minato-ku, Tokyo 105-7133, Japan.

13    All Nippon Airways conducts Passenger Air Transportation throughout the world, including into

14    the U.S. and especially California.

15           13.     Defendant Cathay Pacific Airways is a Hong Kong-based company with its

16    principal place of business at 9 Connaught Road, Central Swirel Housepox Box 1 GPO, Hong

17    Kong K3. Cathay Pacific Airways conducts Passenger Air Transportation throughout the world,

18    including direct transpacific flights into the United States, especially California.

19           14.     Defendant China Airlines is a Taiwanese company with its principal place of

20    business at 131 Nanking E Rd., Section 3, Taipei, Taiwan. China Airlines conducts Passenger

21    Air Transportation throughout the world, including direct transpacific flights into the United

22    States, especially California.

23           15.     Defendant EVA Airways is a Taiwanese company with its principal place of

24    business at 16F.-1, No. 207, Fusing Road, Taoyuan City, Taoyuan County, Taiwan. EVA

25    Airways conducts Passenger Air Transportation throughout the world, including direct

26    transpacific flights into the United States, especially California.

27           16.     Defendant Japan Airlines International is a Japanese company with its principal

28    place of business at 4-11, Higashi-Shinagawa 2-chrome, Shinagawa-Ku, Tokyo 140-8605, Japan.

4

1  Japan Airlines International conducts Passenger Air Transportation throughout the world,

2  including into the United States, especially California.

3      17.    Defendant Malaysia Airlines is a Malaysian corporation with its principal place of

4  business at MAS Complex A, Sultan Abdul Azia Shah Airport, 47200 Suband, Selangor Darui

5  Ehsan, Malaysia. Malaysia Airlines conducts Passenger Air Transportation throughout the world,

6  including into the United States, especially California.

7      18.    Defendant Northwest Airlines is a Delaware corporation with its principal place of

8  business at 2700 Lone Oak Parkway, Eagan, MN 55121. Northwest Airlines conducts Passenger

9  Air Transportation throughout the world, including into the United States, especially California.

10      19.    Defendant Qantas Airways is an Australian company with its principal place of

11  business at Building A, 203 Coward Street, Mascot NSW 2020, Australia. Qantas Airways

12  conducts Passenger Air Transportation throughout the world, including into the United States,

13  especially California.

14      20.    Defendant Singapore Airlines is a Singapore company with its principal place of

15  business at Airline House, 25 Airline Road, 819829 Singapore. Singapore Airlines conducts

16  Passenger Air Transportation throughout the world, including direct transpacific flights into the

17  United States, especially California.

18      21.    Defendant Thai Airways is a Thailand company with its principal place of

19  business at 89 Vibhavadi-Rangsit Road, Bangkok, Thailand 10900. Thai Airways conducts

20  Passenger Air Transportation throughout the world, including direct transpacific flights into the

21  United States, especially California.

22      22.    Defendant United Airlines is a Delaware corporation with its principal place of

23  business at 77 W. Wacker Drive, Chicago, IL 60601. United Airlines is one of the largest

24  passenger airlines in the world with more than 3,600 flights a day to more than two hundred

25  destinations. United Airlines conducts Passenger Air Transportation throughout the world,

26  including into the United States, especially San Francisco International Airport, where United

27  Airlines operates a hub and maintenance operation center. United Airlines is the largest employer

28  in San Mateo County, California, which is located within this district.

23.     At all relevant times, other airlines, trade groups, or other entities, willingly conspired with Defendants in their unlawful restraint of trade. All averments herein against named Defendants are also averred against these unnamed co-conspirators as though set forth at length.

24.     The acts alleged to have been done by Defendants were authorized, ordered or done by their directors, officers, agents, employees, or representatives while actively engaged in the management of each of the Defendants' affairs.

## CLASS ACTION ALLEGATIONS

25.     Plaintiffs bring this action on their own behalf and as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3) on behalf of the following Class:

> All individuals or entities (excluding governmental entities,
> Defendants, and their parents, predecessors, subsidiaries,
> affiliates, and their co-conspirators) who purchased
> passenger air transportation, for long haul transpacific
> flights and who paid a fuel surcharge on their tickets from
> any of the Defendants and their co-conspirators or any
> predecessor, subsidiary, or affiliate of each, at any time
> during the period from May 2004 to August 2007.

26.     Because such information is in the exclusive control of Defendants, Plaintiffs do not know the exact number of Class members. Due to the nature of the trade and commerce involved, however, Plaintiffs believe that Class members number at least in the thousands and are sufficiently numerous and geographically dispersed throughout the United States and the world so that joinder of all Class members is impracticable. It is estimated that there were more than 15 million passengers traveling to the Pacific out of California in 2006.

27.     There are questions of law or fact common to the Class, including:

a.     Whether Defendants engaged in a combination or conspiracy among themselves to fix, raise, maintain, and/or stabilize Passenger Air Transportation and Surcharge prices charged effecting commerce in the United States and throughout the world;

b.     The duration of the conspiracy alleged in this Complaint and the nature and character of the acts performed by Defendants in furtherance of the conspiracy;

c.     Whether the alleged conspiracy violated Section 1 of the Sherman Act;

6

1    d.    Whether the conduct of Defendants, as alleged in this Complaint, caused

2    injury to the businesses or property of Plaintiffs and the other members of the Class;

3    e.    The effect of Defendants' conspiracy on the Passenger Air Transportation

4    and Surcharge prices charged in the United States and throughout the world during the Class

5    Period; and

6    f.    The appropriate measure of damages sustained by Plaintiffs and other

7    members of the Class.

8    28.    Plaintiffs are members of the Class. Plaintiffs' claims are typical of the claims of

9    the Class members. Plaintiffs will fairly and adequately protect the interests of the Class.

10    Plaintiffs purchased Passenger Air Transportation and Surcharges from one or more Defendants,

11    and their interests are coincident with and not antagonistic to those of other members of the

12    Class. Plaintiffs are represented by counsel competent and experienced in the prosecution of

13    antitrust and class action litigation.

14    29.    The questions of law and fact common to the members of the Class predominate

15    over any questions affecting only individual members.

16    30.    A class action is superior to other methods for the fair and efficient adjudication of

17    this controversy. Treatment as a class action will permit a large number of similarly situated

18    persons to adjudicate their common claims in a single forum simultaneously, efficiently, and

19    without the duplication of effort and expense that numerous individual actions would engender.

20    31.    Class treatment will also permit the adjudication of relatively small claims by

21    many Class members who otherwise could not afford to litigate an antitrust claim such as is

22    asserted in this Complaint.

23    32.    This class action presents no difficulties in management that would preclude

24    maintenance as a class action.

25    **TRADE AND COMMERCE**

26    33.    Throughout the Class Period, there was a continuous and uninterrupted flow of

27    Passenger Air Transportation in international commerce throughout the United States and

28    especially into and out of Los Angeles and San Francisco. Defendants' unlawful activities, as

7

1    described herein, took place within the flow of commerce to Passenger Flight customers

2    throughout the world, and had a direct, substantial and reasonably foreseeable effect upon

3    interstate and international commerce in the United States.

4    ## PLAINTIFFS AND THE CLASS SUFFERED INJURY THROUGH

5    ## COLLUSIVE PRICE INCREASES AND SURCHARGES

6        34.    As Defendants controlled a vast majority of the Passenger Flight services during

7    the Class Period with their dominant combined market share, Passenger Flight customers were

8    unable to shop for Passenger Air Transportation from other carriers during that period, because

9    of the lack of competition which allowed Defendants to reap enormous profits from the Fuel

10   Surcharges.

11       35.    In addition, Fuel Surcharges were often treated by Defendants and other carriers

12   similar to a tax or other surcharge, such as an airport facility charge or a government mandated

13   September 11 security charge. As such, Fuel Surcharges were not always advertised as part of

14   Defendants' fares, and were added on to the base fare as part of the purchase transaction.

15       36.    Because surcharges generally are designed to compensate for increased external

16   costs, they should bear a relatively constant relationship to external cost levels. Thus, in a

17   competitive market, Fuel Surcharges should rise and fall at relatively constant ratios to the

18   associated jet fuel costs. Since their inception in 2004, the ratio of Defendants' Surcharges to

19   external costs has increased steadily. The Fuel Surcharges bore no relationship to the Defendants'

20   actual fuel costs or fuel cost increases.

21       37.    The ratio of Defendants' profits to external costs was therefore quite high due to

22   the concerted implementation and maintenance of the agreed-upon Passenger Air Transportation

23   and Fuel Surcharge price levels. So despite increased fuel costs during the Class Period,

24   Defendants' Surcharges were actually responsible for outstanding profit growth for Defendants

25   beyond record fuel costs.

26

27

28

CLASS ACTION COMPLAINT

## DEFENDANTS AND THE PASSENGER FLIGHT MARKET

38.    Each Defendant possesses significant market share on their routes of travel. The principal competitors for the Defendants in the transpacific long haul Passenger Air Transportation market are therefore one another.

39.    Passenger Air Transportation is a commodity product that is fungible in the sense that Passenger Air Transportation provided by any one airline is readily substitutable for the Passenger Air Transportation provided by any other airline.

40.    Passenger Air Transportation is a homogenous service sold by airlines, including Defendants, to airline customers, including Plaintiffs and the members of the Class, primarily based on price.

41.    The Passenger Air Transportation market in the United States and worldwide is highly concentrated, and there exists substantial barriers to entry in this market; both factors facilitate the implementation and maintenance of a horizontal price-fixing cartel such as that perpetrated by Defendants and alleged herein.

## DEFENDANTS' CONCERTED FUEL SURCHARGES

42.    Generally, surcharges are a feature of the global air transportation market, in which airlines charge extra fees to their customers, above and beyond basic flight rate charges, with the intent of defraying certain external costs of the carriers.

43.    Beginning in 2004, Defendants agreed to act in concert with one another in demanding the Surcharges to defray fuel costs and agreeing when and how much to increase the Surcharges to their Passenger Flight customers.

44.    Defendants were aware that their imposition of Fuel Surcharges and other surcharges would not be successful if their supposed competitors did not join them; otherwise, customers would be free to seek out lower prices. For this reason, Defendants entered into agreements to raise surcharges at the same times and in the same amounts.

45.    But for Defendants' Passenger Air Transportation conduct, Defendants would have been unable to perpetrate the extent to which they increased the prices of their Fuel Surcharges.

CLASS ACTION COMPLAINT

46.    The collusion of Japan Airlines International and All Nippon Airways ("ANA") is representative of the behavior of the other Defendants. Japan Airlines International and ANA agreed to raise and lower fares on nearly always the same dates and were in lockstep on surcharges for transpacific fares:

June 8, 2004, ANA files a notice with the Japanese government to raise IATA international fares, in the wake of increased fuel prices, to and from Japan, effective July 1, 5% hike, exception North America economy fares, but not business class.

June 8, 2004, Japan Airlines files a notice with the Japanese government to raise international fares, in the wake of increased fuel prices, to and from Japan, effective July 1, 5% hike, exception North America economy fares, but not business class.

January 5, 2005, ANA announces it will add fuel surcharges on international fares on February 1. The surcharges for transpacific flights were 2,500 yen.

January 20, 2005, Japan Airlines announces it will add fuel surcharges on international passenger fares on February 1. The surcharges for transpacific flights were 2,500 yen.

June 3, 2005, Japan Airlines files a notice with the Japanese government to raise its international fuel surcharge effective July 1.

June 7, 2005, ANA files a notice with the Japanese government to raise its international fuel surcharge effective July 7.

January 16, 2006, Japan Airlines files a notice with the Japanese government to raise its international fuel charge effective March 1.

January 23, 2006, ANA files a notice with the Japanese government to raise its international fuel surcharge, effective March 1.

CLASS ACTION COMPLAINT

August 17, 2006, Japan Airlines files a notice with the Japanese government to raise its international fuel surcharge, effective October 1, from 8,000 yen to 13,600 yen ($66 to $113).

November 16, 2006, Japan Airlines files a notice with the Japanese government to reduce the fuel surcharge on international passenger fares effective January 1, lowering the surcharge from 13,600 yen to 13,000 yen ($113 to $108).

March 19, 2007, Japan Airlines files a notice with the Japanese government to reduce the fuel surcharge on international passenger fares effective May 1, to 11,000 yen or $91.

May 15, 2007, Japan Airlines files a notice with the Japanese government to raise the fuel surcharge on international passenger fares effective July 1, from 11,000 yen or $91 to 12,000 yen or $100.

August 15, 2007, Japan Airlines files a notice with the Japanese government to raise the fuel surcharge on international passenger fares effective October 1, from 12,000 yen or $100 to 13,000 yen or $108.

August 31, 2006, ANA files a notice with the Japanese government to raise its international fuel surcharge, effective October 15, from 8,000 yen to 13,600 yen ($66 to $113).

November 16, 2006, ANA files a notice with the Japanese government to reduce the fuel surcharge on international passenger fares effective January 1, lowering the surcharge from 13,600 yen to 13,000 yen ($113 to $108).

March 20, 2007, ANA files a notice with the Japanese government to reduce the fuel surcharge on international passenger fares effective May 1, to 11,000 yen or $91.

May 25, 2007, ANA files a notice with the Japanese government to raise the fuel surcharge on international passenger fares effective July 10, from 11,000 yen or $91 to 12,000 yen or $100.

August 20, 2007, ANA files a notice with the Japanese government to raise the fuel surcharge on international passenger fares effective October 1, from 12,000 yen or $100 to 13,000 yen or $108.

11

## CARTEL-LIKE TRADE ORGANIZATIONS

47.    Defendants' executives, as well as other air carriers' executives, met formally or informally over the years at various trade meetings or meetings of trade associations, such as the International Air Transport Association, the Association of Asian Pacific Airlines, oneworld, Star Alliance and SkyTeam Alliance. At one or more of these meetings Defendants conspired to artificially inflate fuel Surcharges on international passenger air transportation.

48.    One of the keys to the conspiracy is the 42-year-old Association of Asia Pacific Airlines ("AAPA"). The 17-member trade association, based in Kuala Lumpur, Malaysia, is the most significant group representing Asia/Pacific carriers. The AAPA boasts that its "member airlines carry 285 million passengers and 10 million tonnes of cargo representing approximately one-fifth of global passenger traffic and one-third of global air cargo traffic respectively." Ten of the defendants are members of AAPA.

49.    The primary purpose of AAPA is to serve as a forum for members' views on issues of common interest and to foster close cooperation. According to the organization, "AAPA speaks with a common voice on behalf of the Asia Pacific carriers and puts forward Asian perspectives when dealing with governments, aircraft manufacturers, airport authorities and other organizations on industry issues. The activities of the Association cover every aspect of civil aviation where the airlines feel they can work together for mutual benefit. In addition, AAPA retains access to specialized legal and aviation consultants in Brussels and Washington, a reflection of the significant impact which the profusion of U.S. and E.U. regulatory developments have on all international carriers including Asia Pacific airlines."

50.    AAPA was formed during a meeting of Asian airline executives in 1965 to discuss regional cooperation. The following year, Philippine Airlines, China Airlines, Korean Airlines and Malaysian Airlines officially formed the Orient Airlines Research Bureau. The group evolved into the Orient Airlines Association and in 1996 changed its name to Association of Asia Pacific Airlines.

51.    Another key to the conspiracy is the Geneva-based International Air Transport Association. All of the defendants are members of the IATA, which was founded in 1945 in

Havana, Cuba. IATA represents more than 240 airlines comprising 94% of scheduled international air traffic. It describes itself as "the prime vehicle for inter-airline cooperation." It was an agreement reached at an IATA meeting in Geneva on May 28, 2004 that played a role in triggering the fuel Surcharge conspiracy.

52.    Alliance memberships by airline:

Air New Zealand

- Member of the Association of Asia Pacific Airlines.
- Member of the Star Alliance.
- Member of the International Air Transport Association.

All Nippon Airways

- Member of the Association of Asia Pacific Airlines.
- Member of the Star Alliance.
- Member of the International Air Transport Association.

American Airlines

- Member of oneworld.
- Member of the International Air Transport Association.

Cathay Pacific Airways

- Member of the Association of Asia Pacific Airlines.
- Member of oneworld.
- Member of the International Air Transport Association.

China Airlines

- Member of the Association of Asia Pacific Airlines.
- Member of the International Air Transport Association.

EVA Airlines

- Member of the Association of Asia Pacific Airlines.
- Member of the International Air Transport Association.

Japan Airlines International

- Member of the Association of Asia Pacific Airlines.

- • Member of oneworld.
- • Member of the International Air Transport Association.

Malaysia Airlines

- • Member of the Association of Asia Pacific Airlines.
- • Member of the International Air Transport Association.

Northwest Airlines

- • Member of the SkyTeam Alliance.
- • Member of the International Air Transport Association.

Qantas Airways

- • Member of the Association of Asia Pacific Airlines.
- • Member of oneworld.
- • Member of the International Air Transport Association.

Singapore Airlines

- • Member of the Association of Asia Pacific Airlines.
- • Member of the Star Alliance.
- • Member of the International Air Transport Association.

Thai Airways

- • Member of the Association of Asia Pacific Airlines.
- • Member of the Star Alliance.
- • Member of the International Air Transport Association.

United Airlines

- • Member of the Star Alliance.
- • Member of the International Air Transport Association.

### CODE SHARING BUSINESS PARTNERSHIPS

53.     In addition to the four different alliances/trade groups, various defendants are in effect business partners with each other through what is called code sharing. Code sharing is a business term which was first originated in 1990 when Qantas Airways and American Airlines

1  combined services between an array of U.S. and Australian cities. Code sharing is a legal

2  business arrangement. However, it provides a mechanism to conduct illegal activity.

3      54.    A code share is part of a "cooperative services" agreement between the two

4  carriers. It refers to the practice where a flight operated by an airline is jointly marketed as a

5  flight for one or more other airlines. Most major airlines today have code sharing partnerships

6  with other airlines. "Code" refers to the identifier used in flight schedule, generally the 2-

7  character International Air Transport Association airline designator code and flight number. For

8  example, YY123, flight 123 operated by the airline YY, could be sold by airline ZZ as ZZ456. It

9  is a business partnership that allows airlines to earn revenue by selling tickets on a partner's

10  flight.

11      55. According to the U.S. Department of Transportation and Defendants, the following

12  are the code sharing partnerships of the defendants listed alphabetically:

13      Air New Zealand / EVA Airways

14      Air New Zealand / Qantas (Tasman route)

15      Air New Zealand / Japan Airlines International

16      Air New Zealand / Northwest Airlines

17      Air New Zealand / Singapore Airlines

18      Air New Zealand / Thai Airways

19      Air New Zealand / United Airlines

20      All Nippon Airways / Asiana Airlines

21      All Nippon Airways / EVA Airways

22      All Nippon Airways / Malaysia Airlines

23      All Nippon Airways / Singapore Airlines

24      All Nippon Airways / United Airlines

25      China Airlines / American Airlines

26      Cathay Pacific Airways / American Airlines

27      Cathay Pacific Airways / Japan Airlines International

28      China Airlines / Thai Airways

1    EVA Airways / Air New Zealand

2    EVA Airways / American Airlines

3    EVA Airways / All Nippon Airways

4    EVA Airways / Qantas

5    EVA Air / American Airlines

6    Japan Airlines International / Air New Zealand

7    Japan Airlines International / American Airlines

8    Japan Airlines International / Cathay Pacific

9    Japan Airlines International / Korean Air

10   Japan Airlines International / Northwest Airlines

11   Japan Airlines International / Qantas Airlines

12   Japan Airlines International / Singapore Airlines

13   Japan Airlines International / Thai Airways

14   Malaysia Airlines / All Nippon Airways

15   Malaysia Airlines / Thai Airways

16   Northwest Airlines / Air New Zealand

17   Northwest Airlines / Asiana Airlines

18   Northwest Airlines / Japan Airlines International

19   Northwest Airlines / Korean Air

20   Qantas Airways / Air New Zealand

21   Qantas Airways / American Airlines

22   Qantas Airways / EVA Airways

23   Qantas Airways / Japan Airlines International

24   Singapore Airlines / Air New Zealand

25   Singapore Airlines / Asiana Airlines

26   Singapore Airlines / All Nippon Airways

27   Singapore Airlines / Malaysian Airlines

28   Singapore Airlines / United Airlines

CLASS ACTION COMPLAINT

1    Thai Airways / Air New Zealand

2    Thai Airways / China Airlines

3    Thai Airways / Japan Airlines International

4    Thai Airways / Malaysia Airlines

5    Thai Airways / United Airlines

6    United Airlines / Air New Zealand

7    United Airlines / All Nippon Airways

8    United Airlines / Asiana Airlines

9    United Airlines / Singapore Airlines

10    United Airlines / Thai Airways

11    **CARTEL ACTIVITY MEETINGS**

12    56.    Over the years, executives of Defendant airlines have attended numerous meetings

13    where cartel-like activity was accomplished. Here are a few examples of meetings where

14    executives discussed and agreed on fuel surcharges:

15    57.    The International Air Transport Association, Special Meeting, Geneva, May 28,

16    2004. Fuel costs were the main topic of this meeting and there were agreements on how to add

17    surcharges for fuel. The Montreal Gazette reported on June 1, 2004, that "member carriers of the

18    International Air Transport Association might raise international fares by as much as five percent

19    to help cover a surge in jet fuel costs. The proposed fare increase of between two percent and five

20    percent was agreed at a May 28 meeting of the association, which represents more than 270

21    airlines worldwide, an IATA spokesperson said."

22    58.    The International Air Transport Association Annual General Meeting and World

23    Air Transport Summit, Singapore, June 6-8, 2004. More than 600 airline executives attended this

24    annual summit. Giovanni Bisignani, IATA CEO said in a welcoming statement, "While record

25    high fuel prices challenge our profitability it is time to put our efforts toward rebuilding the

26    industry." Immediately following this meeting on June 8, 2004 both Japan Airlines International

27    and All Nippon Airways filed applications with the Japanese government to raise international

28

17

CLASS ACTION COMPLAINT

1   passenger fares because of high fuel costs. In a news release announcing the Fuel Surcharge hike,

2   Japan Airlines International said:

3        "The application follows a special meeting of the members of the International

4        Air Transport Association in Geneva, May 28, (2004) when a resolution was

5        discussed to raise fares in the wake of increased fuel prices. This resolution has

6        now been adopted."

7   Japan Airlines International and All Nippon Airways were in lockstep on June 8,

8   2004, both announcing on that day that a five percent fuel Surcharge would be go into effect, on

9   the same day for both airlines, July 1, 2004.

10       59.    2005 International Flight Services Association, Global Leadership Conference -

11   Asia Pacific, August 30 - September I, 2005 Tokyo Japan: This meeting was labeled as "The

12   Challenge of Change." Among the participants were, Makoto Fukada, Managing Director and

13   Senior Vice President International Passenger, Japan Airlines; Sandra Pineau, Senior Director of

14   Planning and Design, Continental Airlines; Charles Grossrieder, a manager at Cathay Pacific

15   Airways; Nikom Raviyan, Vice President, Thai Airways; Sandeep Bahl, General Manager,

16   Northwest Airlines, Shigeru Miyata, Vice President, Japan Airlines; Kriengsakdi

17   Phatharacharukul, Director, Thai Airways; and Hee Won Jo, Senior Manager, Asiana Airlines.

18       60.    2nd Annual Asia Pacific & Middle East Aviation Outlook Summit 2006,

19   December 5-6, 2005 Kuala Lumpur, Malaysia: The theme of this meeting was "Towards Best

20   Practice; Maximising Revenues and Minimising Costs." On the first day of the meeting, the

21   guests included Dato Seri Bashir Ahmad, Malaysia Airport's CEO; Willy Boulter, Commercial

22   Director for Virgin Atlantic Airways; and Stanley Kuppusamy, President, International Relations,

23   Singapore Airlines. Fuel surcharges were a topic of discussion.

24       61.    Aviation Emergency Response 2006, AAPA sponsored, September 19-21, 2006

25   Bangkok, Thailand: This meeting was attended by international airport officials and AAPA

26   member executives. Meetings were held on increasing revenues in the transpacific area by way of

27   Fuel Surcharges and other financial means.

28

CLASS ACTION COMPLAINT

62.    3rd Annual Asia Pacific & Middle East Aviation Outlook Summit, November 9-10, 2006 Singapore: Participating in this meeting were executives from most of the Defendant airlines, including Geoff Dixon, CEO of Qantas and Huang Cheng Eng, Executive VP for Singapore Airlines. One of the issues presented and discussed was *"Fighting Costs: Fuel prices and managing risk exposure."*

63.    AAPA Forum, November 28-29, 2006 Bandar Seri Begawan, Brunei Darussalam: More than 120 aviation industry stakeholders attended this meeting, organized by AAPA. At this meeting, Defendants and others discussed surcharges.

64.    Asia Pacific Aviation Summit, July 24-25, 2007 Sydney, Australia: This meeting was put on by the Asia Pacific aviation industry. Some of the issues discussed included the impact of the investigation by the U.S. Department of Justice into fare price fixing. Another topic was "working together efficiently" to diffuse the investigation of added surcharges.

## THE INVESTIGATION

65.    The U.S. Department of Justice ("DOJ") started investigating air passenger fuel surcharge conspiracies worldwide in 2006, particularly transatlantic routes and transpacific routes to and from the West Coast. The DOJ announced on August 1, 2007 a $300 million settlement with British Airways and it cited passenger transatlantic routes. In its news release, the DOJ said: "The Department also charged that between August 2004 and February 2006, British Airways engaged in a conspiracy to suppress and eliminate competition by fixing the Fuel Surcharge charged to passengers on long-haul international flights, including flights between the United States and the United Kingdom."

66.    The DOJ also focused on transpacific flights to and from the United States, noting that investigation is "ongoing" and includes other Defendants named herein.

67.    The DOJ also announced a settlement with Korean Air for fare price fixing on flights from the United States to Korea. The DOJ stated that Korean Air has "agreed to cooperate with the Department's ongoing investigation." Korean Air's unnamed co-conspirator in the passenger fare price fixing via Fuel Surcharges was widely reported to be Asiana Airlines, which sought amnesty.

19

68.     Under the Antitrust Criminal Penalty Enhancement and Reform Act of 2004, a company can apply for leniency from the Department of Justice for its participation in antitrust activities. Under the so-called Corporate Leniency Program, if a company comes forward with information about antitrust activities and cooperates in the investigation, it is eligible for conditional amnesty from prosecution.

69.     Both Korean Air and Asiana Airlines are among the top transpacific carriers in the world. It was not the first time Korean Air and Asiana Airlines have been implicated in collusion and anticompetitive behavior. The Korean Fair Trade Commission fined Korean Air and Asiana in 2001 for conspiring to set passenger air transportation services in Korea.

70.     In addition, several of the Defendants and unnamed co-conspirators have been identified as targets and or subjects in international investigations by the U.S. Department of Justice and the European Union into air cargo fuel surcharge price fixing. The targets, many of which are also named in civil suits, include All Nippon Airways, American Airlines, Asiana Airlines, Japan Airlines, Korean Airlines, Northwest Airlines, Qantas Airways and United Airlines. In both the air passenger and cargo investigations, Defendants and other airlines are accused of developing and participating in conspiracies to increase revenue by assessing inflated Fuel Surcharges.

## ADMISSIONS BY CO-CONSPIRATORS

71.     On August 13, 2007, Qantas Chief Executive Officer Geoff Dixon announced that Qantas Airways would set aside $40 million to cover a potential fine in the United States as a result of Fuel Surcharges and price fixing in its freight division. In a news release, Dixon was quoted as saying:

"On 1 August 2007, the U.S. Department of Justice announced that British Airways and Korean Air had agreed to plead guilty and pay separate US$300 million criminal fines for their roles in conspiracies to fix prices of passenger and cargo flights. British Airways subsequently announced that US$200 million of its fine related to cargo. Based on these developments, a decision has been made to make a US$40 million (A$47 million) provision in the 2006/07 Financial Accounts!"

20

CLASS ACTION COMPLAINT

1   Dixon also was quoted as saying:

2          "We have investigated this issue thoroughly and are confident that the unacceptable

3          conduct was limited to a small number of people."

4          72.    On October 6, 2007, the Japanese daily newspaper *Asahi Shimbun* reported that

5   Japan Airlines International would book a roughly $171 million charge for potential fines from a

6   global price fixing probe by U.S. and European Union officials. The newspaper said:

7          "The company's move comes after the U.S. Justice Department fined British Airways

8          PLC and Korean Air Lines Co. $300 million each in August for fixing the prices of

9          passenger and cargo flights with other airlines. The companies allegedly conspired to set

10         fuel surcharges when oil prices rose."

11                              **VIOLATIONS ALLEGED**

12         73.    During the Class Period Defendants engaged in a continuing agreement,

13  understanding, and conspiracy in restraint of trade to artificially raise, fix, maintain, and/or

14  stabilize the prices of Passenger Air Transport and Fuel Surcharges in the United States and

15  throughout the world in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

16         74.    In formulating and effectuating the alleged contract, combination, or conspiracy,

17  Defendants engaged in anti-competitive activities, the purpose and effect of which were to

18  artificially raise, fix, maintain, and/or stabilize the prices of Passenger Air Transport and Fuel

19  Surcharges. These activities included the following:

20         a.     agreeing to charge prices of Passenger Air Transport and Fuel Surcharges

21  at certain levels and otherwise to fix, raise, maintain, and/or stabilize the prices of Passenger Air

22  Transport and Fuel Surcharges charged in the United States and throughout the world;

23         b.     charging Passenger Air Transport and Fuel Surcharges at the agreed-upon

24  rates;

25         c.     signaling increases in the price of Passenger Air Transport and Fuel

26  Surcharges by, inter alia, publicly announcing their increases;

27         d.     moving prices of their Passenger Air Transport and Fuel Surcharges in

28  lockstep; and

e.    announcing new Passenger Air Transport and Fuel Surcharges prices nearly simultaneously or within days of each other.

75.    During the Class Period, the Defendants increased the Passenger Air Transport and Fuel Surcharges they charged. These increases in Passenger Air Transport and Fuel Surcharges cannot be explained by actual increases in fuel prices or supply/demand forces, but rather were the result of anticompetitive conduct.

76.    During the Class Period, Plaintiffs and members of the Class purchased Passenger Air Transportation directly from Defendants (or their agents, subsidiaries, and/or controlled affiliates).

77.    The illegal combination and conspiracy alleged herein has had the following effects, among others:

a.    Price competition in the pricing of Passenger Air Transportation and Fuel Surcharges thereon has been restrained, suppressed, and/or eliminated;

b.    Price competition in the contracting of Passenger Air Transportation has been restrained, suppressed, and/or eliminated;

c.    Prices for Passenger Air Transportation and Fuel Surcharges thereon charged by Defendants have been fixed, raised, maintained, and/or stabilized at artificially high, non-competitive levels; and

d.    Members of the Class have been deprived of the benefit of free and open competition.

## INJURY TO PLAINTIFFS AND THE CLASS

78.    During the Class Period, Plaintiffs and the members of the Class, because of Defendants' antitrust violations, paid Surcharges and other fees they would not have paid absent such violations.

79.    As a result, Plaintiffs and the members of the Class it seeks to represent have been injured and damaged in their business and property in an amount to be determined according to proof.

CLASS ACTION COMPLAINT

80.     As a direct and proximate result of the illegal conspiracy, Plaintiffs and the members of the Class have been injured and financially damaged in their respective businesses and property, in that they have paid Surcharges and other fees during the Class Period they would not have paid in the absence of the illegal conspiracy.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that:

A.     The Court determine that this action may be maintained as a class action under Rule 23(a) and (b) (3) of the Federal Rules of Civil Procedure;

B.     The Court adjudge and decree that the contract, combination and conspiracy alleged herein is a per se unreasonable restraint of trade in violation of Section 1 of the Sherman Act;

C.     Judgment be entered against Defendants, jointly and severally, and in favor of Plaintiffs and the Class for damages as allowed by law as determined to have been sustained by them, and that all damages are trebled in accordance with the antitrust laws;

D.     Each of the Defendants, successors, assigns, parents, subsidiaries, affiliates and transferees, and their respective officers, directors, agents and employees, and all other persons acting or claiming to act on behalf of Defendants or in concert with them, be permanently enjoined and restrained from, in any manner, directly or indirectly, continuing, maintaining or renewing the combinations, conspiracy, agreement, understanding or concert of action, or adopting any practice, plan, program or design having a similar purpose or effect in restraining competition;

E.     The Court award Plaintiffs and the Class attorneys' fees and costs, and pre judgment and post judgment interest as permitted by law; and

F.     The Court award Plaintiffs and the Class such other and further relief as may be necessary and appropriate.

CLASS ACTION COMPLAINT

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure and the Constitution of the United States, Plaintiff demands a trial by jury of all issues so triable.

DATED:  January 23, 2008

Guido Saveri (22349)
R. Alexander Saveri (173102)
Cadio Zirpoli (179108)
William Heye (233249)
SAVERI & SAVERI, INC.
111 Pine Street, Suite 1700
San Francisco, CA  94111
Telephone: (415) 217-6810

Eugene A. Spector
William G. Caldes
SPECTOR, ROSEMAN & KODROFF, P.C.
1818 Market Street, Suite 2500
Philadelphia, PA 19103
Telephone: (215) 496-0300

Attorneys for Plaintiffs

Airpassenger.012

CLASS ACTION COMPLAINT